IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| STEVEN NOFFSINGER, | ) | |
| | ) | |
| Plaintiff, | ) | No. 09 C 916 |
| v. | ) | |
| | ) | Judge Robert W. Gettleman |
| THE VALSPAR CORPORATION, a Delaware | ) | |
| Corporation, d/b/a C&M COATINGS and d/b/a | ) | |
| VALSPAR INDUSTRIAL, and ENGINEERED | ) | |
| POLYMER SOLUTIONS, INC., d/b/a | ) | |
| VALSPAR COATINGS, a Delaware Corporation, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Steven Noffsinger filed a three-count amended complaint alleging strict liability and negligence claims (along with an alternate negligence claim under a res ipsa loquitor theory, which this court dismissed in its order dated May 26, 2010) against defendants The Valspar Corporation and its subsidiary, Engineered Polymer Solutions, Inc. Defendants have filed the instant motion under Fed. R. Evid. 104(a) to exclude the testimony of four of plaintiff's expert witnesses. Defendants contend that without this testimony, plaintiff cannot establish the elements of his claims, and therefore have also moved for summary judgment under Fed. R. Civ. P. 56. Along with his response to that motion, plaintiff moved to strike Exhibit I of defendants' motion to exclude and for summary judgment (actually an exhibit to defendants' Local Rule 56.1 statement of facts). A day after those filings, plaintiff filed a motion to supplement his response in opposition to defendants' motion with an after-acquired medical record. In addition, plaintiff has filed a motion to reconsider the court's April 20, 2011, scheduling order and to strike two opinions of Joel Cohen, an expert witness offered by defendants. Also pending is plaintiff's objections to Magistrate Judge Brown's June 17, 2011, memorandum opinion and order. For the

following reasons, the court denies defendants' motion to exclude and for summary judgment, denies as moot plaintiff's motion to strike Exhibit I, denies as moot plaintiff's motion to supplement, and denies plaintiff's motion to strike Mr. Cohen's opinions two and three. Plaintiff's objections to Magistrate Judge Brown's June 17, 2011, order are also denied.

## BACKGROUND

Unless otherwise specified, the following facts are undisputed. In February 2007, Valspar hired Midwest Coast Transport, Inc., for which plaintiff worked as a commercial truck driver, to deliver 72 55-gallon drums of Dynamprime paint, a solvent-based coating designed for use on metal coils, from Valspar's plant in Kankakee, Illinois, to Santa Fe Springs, California. On his way to Santa Fe Springs, plaintiff and his dog, Boomer, stopped to spend the night at a truck stop. Plaintiff awoke early in the morning of February 17, 2007, and discovered that Dynaprime was leaking from the front and rear of the trailer, and had pooled near the drive tires outside the cab of the truck. Plaintiff alleges that he developed permanent respiratory injuries—specifically, Reactive Airways Dysfunction Syndrome, or RADS—as a result of exposure to the paint fumes. On March 30, 2007, Boomer died.

RADS was first named and described in an academic article, based on a study of 500 asthma patients, that was published in 1985. See Stuart M. Brooks, Mark A. Weiss & I.L. Bernstein, Reactive Airways Dysfunction Syndrome: Persistent Asthma Syndrome After High Level Irritant Exposures, 88 Chest 376 (Sept. 1985). Based on their examinations of those patients, the authors arrived at eight criteria for diagnosing RADS, id. at 377 (Table 1):

1. A documented absence of respiratory complaints.

2. The onset of symptoms occurred after a single specific exposure or accident.

3. The exposure was to a gas, smoke, fume, or vapor present in a very high concentration and which had irritant qualities.

4. The onset of symptoms occurred within 24 hours after the exposure and persisted for at least 3 months.

5. Symptoms simulated asthma with cough, wheezing, and dyspnea predominating.

6. Pulmonary function tests may show airflow obstruction.

7. Methacholine challenge testing was positive.

8. Other types of pulmonary disease were ruled out.

At trial, plaintiff intends to present the testimony of five expert witnesses.[1] Dr. Thomas Milby, an expert on RADS and causation, would testify that plaintiff suffers from RADS caused by exposure to Dynaprime fumes on February 17, 2007. Similar testimony would be offered by Dr. James Tita, a pulmonologist who served as plaintiff's primary treating physician from June 13, 2007, until July 2010. Dr. Karen Pacheco, whom plaintiff states has been his treating physician since July 26, 2010, will testify that plaintiff suffers from RADS.[2] Dr. Sheldon Mostovoy is a metallurgist who would offer expert testimony that the drum had an obvious defect that defendants could have discovered before filling it with Dynaprime. Finally, Dr.

---

[1] Plaintiff also disclosed Dr. Ross Myerson, a toxicologist, as a rebuttal witness.

[2] Plaintiff offered Dr. Pacheco as both a Rule 26(a)(2)(A) treating physician and a Rule 26(a)(2)(B) rebuttal witness. Magistrate Judge Brown previously struck Dr. Pacheco as a Rule 26(a)(2)(B) witness and ruled that she may not testify on causation, finding that it was unclear whether she was a treating physician and that her opinions, which were "patently prepared for purposes of this lawsuit," were not timely disclosed. This court affirmed that ruling as being neither clearly erroneous nor contrary to law. Dr. Pacheco's testimony will therefore be limited to her treatment and diagnosis of plaintiff. See Dkt. 154.

Kenneth Brown, an expert in the paint and coating industry, would offer expert testimony regarding defendants' efforts to inspect the drum before filing it with Dynaprime.

## DISCUSSION

**A.  Defendants' Motion to Exclude Testimony of Thomas Milby, James Tita, Sheldon Mostovoy, and Kenneth Brown**

**1.  Legal Standard**

Federal Rule of Evidence 702 and Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993), govern the admissibility of expert testimony. See Lewis v. CITGO Petroleum Corp., 561 F.3d 698, 705 (7th Cir. 2009). Under Rule 702, "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case."

The court serves as a "gatekeeper" to ensure that the expert's testimony "is sufficiently reliable to qualify for admission." Mihailovich v. Laatsch, 359 F.3d 892, 918 (7th Cir. 2004) (citing Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 147 (1999)). To do this, the court asks whether: (1) "the witness is qualified;" (2) "the expert's methodology is scientifically reliable;" and (3) "the testimony will 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" Myers v. Ill. Cent. R.R. Co., 629 F.3d 639, 644 (7th Cir. 2010) (quoting Ervin v. Johnson & Johnson, Inc., 492 F.3d 901, 904 (7th Cir. 2007)). The Seventh Circuit instructs that the court's "focus . . . must be solely on principles and methodology, not on the conclusions they generate." Winters v. Fru-Con Inc., 498 F.3d 734, 742 (7th Cir. 2007)

(quoting Chapman v. Maytag Corp., 297 F.3d 682, 687 (7th Cir. 2002)). Ultimately, "[t]he proponent of the expert bears the burden of demonstrating that the expert's testimony would satisfy the Daubert standard." Lewis, 561 F.3d at 705.

The Supreme Court has offered the following non-exclusive factors to aid courts in determining whether a particular expert opinion is grounded in a reliable scientific methodology: (1) whether the proffered theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) whether the theory has a known or potential rate of error; and (4) whether the relevant scientific community has accepted the theory. Daubert, 509 U.S. at 592-93; Happel v. Walmart Stores, Inc., 602 F.3d 820, 824 (7th Cir. 2010). The 2000 Advisory Committee Notes to Rule 702 provide additional factors, including whether: (1) the testimony relates to matters growing naturally and directly out of research that was conducted independently from the instant litigation; (2) the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion; (3) the expert has adequately accounted for obvious alternative explanations; (4) the expert is being as careful as she would be in her regular professional work outside of paid litigation consulting; and (5) whether the expert's field of expertise is known to reach reliable results for the type of opinion the expert is giving. See Am. Honda Motor Co., Inc. v. Allen, 600 F.3d 813, 817 (7th Cir. 2010); Fuesting v. Zimmer, Inc., 421 F.3d 528, 534–35 (7th Cir. 2005), vacated in part on other grounds, 448 F.3d 936 (7th Cir. 2006).

**2.      Motions to Exclude Expert Witness Testimony**

Defendants have moved to exclude the testimony of four of plaintiffs' expert witnesses. For the following reasons, this motion is denied in its entirety.

**Drs. Milby & Tita**

Drs. Milby and Tita are plaintiff's proffered medical causation experts. Dr. Milby is an expert on RADS and causation who would testify that plaintiff has RADS caused by exposure to Dynaprime fumes on February 17, 2007. Dr. Tita, a treating pulmonologist for plaintiff, would also testify that plaintiff suffers from RADS caused by exposure to Dynaprime fumes on February 17, 2007.

Defendants contend that the methodology used by these two experts is not scientifically reliable because "the Seventh Circuit's standard for proving medical causation in chemical exposure cases" requires experts to do two things that these experts did not: (1) specify a <u>particular</u> chemical in the substance to which the patient was exposed that caused RADS; and (2) identify the <u>level</u> of that chemical to which the patient was exposed. (In all, according to defendants, this "standard" requires "that a toxicologist offering causation testimony must know, at a minimum, (1) the substance alleged to have caused the injury, (2) the amount of the substance to which Plaintiff was exposed, (3) the duration of the exposure, and (4) whether the dose Plaintiff received was sufficient to cause injury.") Because, however, this is not the standard, and because the court concludes that the experts' testimony is based on scientifically reliable methodology, Rule 702 and <u>Daubert</u> do not bar this admission of this testimony.

As an initial matter, there is no support for defendants' proclaimed "Seventh Circuit standard for proving medical causation in chemical exposure cases." The lone Seventh Circuit case they cite does not support the proposition for which they cite it. <u>Wintz v. Northrop Corp.</u>,

110 F.3d 508, 513 (7th Cir. 1997), did not "adopt" the Federal Judicial Center's Reference Manual on Scientific Evidence, as defendants claim; it merely referred to the Manual's chapter on toxicology for three "'preliminary assessments'" an expert toxicologist should make "as premises for an opinion." Wintz, 110 F.3d at 513 (citing "Reference Guide on Toxicology," Reference Manual on Scientific Evidence 201 (1st ed. 1994) (listing the "three preliminary assessments" on which an "opinion on causation should be premised")); see "Reference Guide on Toxicology," Reference Manual on Scientific Evidence 419 (2d ed. 2000) (same). But rather than referring to these three assessments,[3] defendants list four criteria (from the Manual's 2000 edition—they do not even appear in the 1994 version used in Wintz) that an expert should acquire to assist in determining causation, incorrectly asserting that "[i]n Wintz, the Seventh Circuit excluded the expert's medical causation opinions because they failed to address these minimal requirements."[4]

Further, Wintz presented a completely different question. There, it was undisputed that the plaintiff had been exposed to a particular chemical (bromide) while pregnant with her

---

[3] The three preliminary assessments are: "First, the expert should analyze whether the disease can be related to chemical exposure by a biologically plausible theory. Second, the expert should examine if the plaintiff was exposed to the chemical in a manner that can lead to absorption into the body. Third, the expert should offer an opinion as to whether the dose to which the plaintiff was exposed is sufficient to cause the disease." "Reference Guide on Toxicology," Reference Manual on Scientific Evidence 201 (1994); see "Reference Guide on Toxicology," Reference Manual on Scientific Evidence 419 (2000).

[4] Perhaps defendants arrived at the theory that the Seventh Circuit has adopted the Reference Manual in its entirety after reading Taylor v. Union Pac. R.R. Co., 09-123-GPM, 2010 WL 3724283, at *4 (S.D. Ill. Sept. 16, 2010), in which the court—also referring specifically to the "three preliminary assessments" for a causation opinion—stated that the 1994 Manual "has been adopted in this circuit." For this principle, the Taylor court cited Wintz, 110 F.3d at 513, and Grant v. Chemrex, Inc., No. 93 C 0350, 1997 WL 223071, at *11 n.5 (N.D. Ill. Apr. 28, 1997), which quotes Wintz's "three preliminary assessments" excerpt from the 1994 Manual.

daughter, who suffered from birth defects. The court found that the expert knew nothing about bromide or birth defects. Here, there are no allegations that plaintiff's experts lack sufficient knowledge of RADS to form medical opinions on its causation.

The court has located only one case, Lemmermann v. Blue Cross Blue Shield of Wis., 713 F. Supp. 2d 791, 808 (E.D. Wis. 2010), in which a court in this circuit used defendants' preferred four-criteria framework. Citing to only one case (from the Southern District of Illinois), that court proclaimed that "[f]ederal courts, including those within this circuit, have used the [four-criteria] framework in the Reference Manual on Scientific Evidence in analyzing the methodology of an expert providing testimony espousing an external cause for a particular medical ailment." Lemmermann, 713 F. Supp. 2d at 808. That court also stated, however, that "[t]his is not to say that every expert testifying regarding external causation must follow this method in the Reference Manual on Scientific Evidence. Rather, the court is merely, by comparison, demonstrating how [the expert's] methodology was completely divorced from other acceptable methods for determining an external cause for a medical ailment." Id. at 809 n.22. The Lemmermann court excluded the expert's testimony because "the expert had not undertaken any effort to explain her findings regarding causation." Id. at 809.

Thus, an expert's failure to answer precisely each of the four questions posed by the Reference Manual on Scientific Evidence does not render his testimony per se unreliable. It is equally clear that the particular flaws defendants claim to have found in Drs. Milby and Tita's proffered testimony are spurious.

First, defendants insist that all toxicologists offering medical causation testimony must know the substance alleged to have caused the injury, with no exceptions for diseases that, like

8

RADS, are not defined as having been caused by a specific chemical. But because the medical literature defines RADS as being caused by unspecified irritants, it would be unnecessary—and potentially impossible—for a medical expert to isolate a chemical within the substance to which a RADS patient was exposed. See Emil J. Bardana, Jr., MD, Reactive Airways Dysfunction Syndrome (RADS): Guidelines for Diagnosis and Treatment and Insight into Likely Prognosis, 83 Annals of Allergy, Asthma, & Immunology 584 (Dec. 1999). Defendants argue that "[t]his district has [ ] excluded medical causation opinions based on the same grounds in RADS cases," but the one case they cite, Schmaltz v. Norfolk & W. Ry. Co., 878 F.Supp. 1119 (N.D. Ill. 1995), is entirely inapposite. That court rejected a proffered expert's testimony for a number of reasons that are not present here: for example, the plaintiff had testified that he was not present when the chemical was sprayed and that he never had contact with it, and it was undisputed that the chemical's concentration was below the permissible exposure limit established by the Occupational Safety & Health Administration at the time of the alleged exposure. Id. at 1122.

  Second, defendants claim that because the diagnostic criteria for RADS includes "a finding of a high intensity exposure to a respiratory irritant," and Drs. Milby and Tita cannot point to a precise amount of plaintiff's exposure to Dynaprime, their testimony is not scientifically reliable. Plaintiff correctly disputes the first premise of that claim. The medical literature, which plaintiff does not dispute (and in fact cites), states that "[e]xposure to an irritant vapor, gas, fumes, or smoke in very high concentrations" is one of the diagnostic criteria for RADS. Stuart M. Brooks and James D. McCluskey, When to Suspect Reactive Airways Dysfunction Syndrome, 23 Journal of Respiratory Diseases 10, 508 (Oct. 2002) (Table 1 - Diagnostic Criteria for RADS). That same article, however, also notes that because "[a]lmost all

9

instances are accidental, [ ] the recording of concentrations is not possible." Thus, "[i]t is not possible to quantify the magnitude of the irritant exposure necessary to cause RADS." Id. From this and other articles, a precise level of exposure to an irritant is not part of the medical diagnosis of RADS. The fact that Drs. Milby and Tita do not purport to have defined a level of plaintiff's exposure does not, therefore, render their testimony inadmissible. "The goal of Daubert is to assure that experts employ the same 'intellectual rigor' in their courtroom testimony as would be employed by an expert in the relevant field," and the medical literature makes clear that an expert in the RADS field would do no more than what plaintiff's experts have offered here. See Jenkins v. Bartlett, 487 F.3d 482, 489 (7th Cir. 2007) (quoting Kumho Tire Co., 526 U.S. at 152).

More generally, defendants question the legitimacy of the differential etiology methodology, which Drs. Milby and Tita used to arrive at plaintiff's RADS diagnosis. In a differential etiology analysis, "the doctor rules in all the potential causes of a patient's ailment and then by systematically ruling out causes that would not apply to the patient, the physician arrives at what is the likely cause of the ailment." Myers, 629 F.3d at 644. The Seventh Circuit has clearly stated that "[t]here is nothing controversial about" differential etiology. Id.; see also Lemmermann v. Blue Cross Blue Shield of Wis., 713 F. Supp. 2d at 809 n.21 (criticizing RADS expert's failure to employ the differential diagnosis methodology as "sloppy and indicative of an unreliable method"). Defendants have offered nothing that casts doubt on that conclusion or its application to a RADS diagnosis in particular. Defendants also argue that Drs. Milby and Tita did not rule out all other potential, known causes for plaintiff's injuries, but such critiques go not to the methodology that they used but to the weight of their opinions.

10

For these reasons, defendants' motion to exclude the testimony of Drs. Milby and Tita is denied.

**Dr. Mostovoy**

Plaintiff has designated Dr. Sheldon Mostovoy as an expert witness to offer three related opinions regarding the faulty drum: (1) the drum was defective because it was manufactured from flawed steel; (2) the crack in the drum was obvious when Valspar received it from its drum supplier; and (3) the crack began on the bottom of the drum, and was visible to anyone who looked at the bottom of the drum before it was filled with Dynaprime. Defendants claim that these opinions are inadmissible because Dr. Mostovoy's testimony does not meet Rule 702's "fit" requirement, which demands a link between the facts or data the expert has used and the conclusion the expert's testimony intends to support. Fed. R. Evid. 702; see Daubert, 509 U.S. at 593; United States v. Mamah, 332 F.3d 475, 478 (7th Cir. 2003).

In response to defendants' critiques—principally attacking Dr. Mustovoy's assumptions about the drum's size and shape[5]—plaintiff offers an affidavit from Dr. Mustovoy that explains why those assumptions are irrelevant to his calculations and conclusions. According to defendants, this affidavit "does not address, in any way, the fit problems with [Dr. Mostovoy's] opinions," but that misses the point. As the affidavit confirms, defendants' attempts to undermine Dr. Mostovoy's assumptions do not implicate Rule 702's "fit" requirement. If defendants believe that Dr. Mostovoy's assumptions are inaccurate, their proper recourse is vigorous cross-examination. See Smith v. Ford Motor Co., 215 F.3d 713, 719 (7th Cir. 2000) ("The question of whether the expert is credible or whether his or her theories are correct given

---

[5] It appears that the actual drum was not available.

11

the circumstances of a particular case is a factual one that is left for the jury to determine after opposing counsel has been provided the opportunity to cross-examine the expert regarding his conclusions and the facts on which they are based.") (citation omitted).

Defendants' motion to exclude Dr. Mostovoy's testimony is denied.

**Dr. Brown**

Dr. Brown, an expert in the paint and coating industry, would offer three opinions: (1) that defendants did not employ reasonable care to meet industry standards in receiving, handling, inspecting, and filling the drums of Dynaprime; (2) that if defendants had exercised reasonable care in inspecting drums, the crack would have been discovered and the accident avoided; and (3) Dynaprime vapors were released when the leak occurred and, due to their volatility, the vapors would have been present in or near the truck cab and storage area.

Defendants challenge the factual basis for all three opinions, arguing that because Dr. Brown lacks knowledge of the drum supplier's inspection procedures, he has no basis for determining that defendants' practices failed to conform to industry standards or that they could have done more to prevent the leak. But Dr. Brown's opinions do not depend on what inspection procedures the drum supplier used. Rather, his opinions are premised on his view that defendants had an independent obligation to inspect drums, based in part on the paint industry's standards—with which Dr. Brown testified he was familiar.

Defendants further contend that Dr. Brown's first opinion should be excluded as an impermissible legal conclusion, citing Good Shepherd Manor Foundation, Inc. v. City of Momence, 323 F.3d 557, 564 (7th Cir. 2003), for the proposition that "expert testimony as to legal conclusions that will determine the outcome of the case is inadmissible." Dr. Brown's

opinion that defendants did not use reasonable care is not a bare legal conclusion; it is an opinion of the standard of care in defendants' industry and his factual determination that they failed to adhere to that standard. "There is no doubt that under Rules 702 and 704 an expert may testify about applicable professional standards and the defendants' performance in light of those standards." Richman v. Sheahan, 415 F. Supp. 2d 929, 945; see Dowe v. Nat'l R.R. Passenger Corp., No. 01 C 5808, 2004 WL 887410, at *1 (N.D. Ill. Apr. 26, 2004) ("With explanation, testimony regarding the reasonableness or unreasonableness of particular conduct will assist the jury in understanding the evidence and determining facts in issue, and will not simply 'tell the jury what result to reach.'") (citing Fed. R. Evid. 704); see also Owen v. Kerr-McGee Corp., 698 F.2d 236, 239-40 (5th Cir. 1983) (conformity to standard of care "is a factual question," "not a legal conclusion," and expert can testify regarding whether what was done conformed with the industry standards).

      Defendants also challenge the methodology Dr. Brown used to arrive at his third opinion—that "vapors would be present in or near the truck storage area and the truck cab due to their volatility." Specifically, defendants contend that Dr. Brown's methodology was insufficient to allow him to determine a number of factors—"the quantity of potential fumes or vapors released from the leaked Dynaprime, the rate at which the vapors would have been released, and the direction the vapors would have traveled"—without which it would be impossible to determine that "any vapors actually ever entered the cab of the truck." This is illogical. Dr. Brown need not have made precise determinations of these factors to determine that vapors were present in some unspecified amount. After plaintiff pointed this out in his

response, defendants failed to reply on this point, probably because they had no valid counterargument.

Defendants' motion to exclude Dr. Brown's testimony is denied.

### 3.     Motion for Summary Judgment

Defendants' sole basis for requesting summary judgment is their contention that plaintiff's expert testimony is inadmissible.  Because, for the reasons discussed above, the court is overruling defendants' objections to plaintiff's expert testimony, defendants' motion for summary judgment is denied.

### B.     Plaintiff's "Motion to Strike Exhibit I to Defendants' Motion to Exclude Experts and for Summary Judgment"

Along with his response to the motion to exclude and for summary judgment, plaintiff filed a "Motion to Strike Exhibit I to Defendants' Motion to Exclude Experts and for Summary Judgment."  (In fact, the exhibit to which plaintiff refers—the declaration of Sal Corrao of the Barstow Fire Protection District—was attached to defendants' L.R. 56.1 statement of facts in support of their motion to exclude and for summary judgment.)  In moving to strike Corrao's declaration, plaintiff noted: "Plaintiff's Response is due September 12, 2011.  The purpose of this Motion is to strike a submission by Defendants in support of that Motion in advance of consideration of the merits, so that Plaintiff's Response may be most effective and streamlined."  It is doubtful, however, that devoting twenty-plus pages to briefing this issue—and the ancillary issue of whether this was properly raised as a separate motion, to which the parties devote substantial ink—has accomplished much in the way of streamlining the proceedings.  Moreover, it is unclear why plaintiff thought that a ruling on the issue would help him to focus his response to defendants' motion to exclude and for summary judgment, because plaintiff filed that

response at the same time as this motion. Plaintiff's motion to strike the declaration of Sal Corrao is therefore denied as moot.[6]

C.   **Plaintiff's Motion to Supplement Plaintiff's Response in Opposition to Defendants' Motion to Exclude with After-Acquired Medical Record**

A day after filing his response to defendants' motion to exclude and for summary judgment, plaintiff received the report from his July 27, 2011, visit to Dr. Pacheco. Plaintiff's response included reports of his medical treatment from Dr. Pacheco, but stated that the July 27 report was missing because it was not yet available. When it became available the next day, plaintiff sought to supplement his response by adding this report. Defendants opposed the motion, arguing that because Magistrate Judge Brown's June 17, 2011, order had denied plaintiff's motion to supplement his disclosure of Dr. Milby with Dr. Pacheco's reports, the court "should not consider any of Dr. Pacheco's records in ruling on [defendants'] Motion to Exclude or its Motion for Summary Judgment." Because the court has not, and need not, consider Dr. Pacheco's reports to rule on those motions, plaintiff's motion to supplement is denied as moot.

D.   **Plaintiff's Combined Motion to Reconsider April 20, 2011, Scheduling Order and Plaintiff's Motion to Strike Opinions Two and Three of Industrial Hygienist Joel Cohen**

Defendants disclosed Joel Cohen, an industrial hygienist, as an expert to provide opinions regarding plaintiff's exposure to Dynaprime fumes. He offers three opinions: (1) because of the limited information in this case, "it is not possible to conduct a quantitative exposure assessment," so "[i]t would be speculative to offer a quantitative estimate of exposure"; (2)

---

[6] Plaintiff has objected to this declaration on the ground that it includes inadmissible hearsay within hearsay. Because it is unclear whether this exhibit would be offered at trial, the court need not reach the merits of the objection at this time.

15

plaintiff's exposure to Dynaprime fumes "would more likely than not have been well below the applicable airborne exposure limits established by NIOSH [the National Institute for Occupational Safety and Health], ACGIH [the American Conference of Industrial Hygenists] and OSHA [the Occupational Safety and Health Administration]"; and (3) if plaintiff was exposed to irritants in Dynaprime fumes, the concentration of the exposure would have been extremely low.

Plaintiff argues that Mr. Cohen, as a non-physician, cannot "override" his experts' medical determination that he was exposed to sufficient Dynaprime fumes to cause RADS, thus rendering Mr. Cohen's opinions "irrelevant and unhelpful to the jury." Plaintiff also argues that Mr. Cohen's conclusions are inadmissible "because they are undone by his own admissions that attempting to quantify [plaintiff's] exposure would be speculative"; that is, Mr. Cohen cannot both state that it is impossible to determine the quantity of vapors to which plaintiff was exposed (Opinion 1) and opine that the exposure was below a particular standard (Opinions 2 and 3).

In April 2011, plaintiff filed a motion to amend the briefing schedule for defendants' summary judgment motion to allow plaintiff to file a <u>Daubert</u> motion raising these issues and requesting that the court exclude Mr. Cohen's second and third opinions. The court denied the motion, determining that it would be more efficient to first address defendants' potentially dispositive summary judgment motion. In their reply in support of that motion, however, defendants rely on Mr. Cohen's opinions to argue that it is uncontested that plaintiff could not have been exposed to sufficient fumes to contract RADS. Plaintiff thus argues that he should be permitted the opportunity to address the admissibility of these opinions before the court relies on them in excluding his experts and granting summary judgment for defendants. At the hearing on

November 23, 2011, the court granted plaintiff's motion to reconsider the April 2011 scheduling order and allowed defendants time to respond to plaintiff's motion to strike Mr. Cohen's second and third opinions. Defendants' response attacks plaintiff for his "delay" in challenging Mr. Cohen's testimony, but because the court had already permitted plaintiff to challenge Mr. Cohen's opinions, this line of attack is pointless. Defendants' confusion is evinced by their criticism of plaintiff for "fail[ing] to challenge Mr. Cohen's opinion" in his response to their summary judgment motion—but the reason plaintiff did not was that the court had denied his motion to do so.

Insofar as this motion is limited to the court's consideration of Mr. Cohen's opinions in evaluating defendants' motion to exclude and for summary judgment, it is moot. Plaintiff also argues, however, that Mr. Cohen's second and third opinions should be "given no consideration . . . in any other aspect of this case whatsoever." But neither of plaintiff's reasons for excluding Mr. Cohen's opinions is meritorious.

Plaintiff's first argument—that an industrial hygienist cannot testify on medical causation—misses the mark. Plaintiff's underlying theory is that because diagnosing RADS does not require quantitative proof of exposure, an industrial hygienist's testimony on amount of exposure could not possibly be helpful the jury. It is true that, in the course of denying defendants' motion to strike plaintiff's expert testimony, the court has rejected defendants' unsupported contention that plaintiff must offer evidence of how much Dyanprime he was exposed to. But the fact that plaintiff <u>could</u> potentially prove his case without this evidence does not mean that this evidence is irrelevant or unhelpful. Plaintiff's belief that his theory and

evidence will be more persuasive than defendants' does not render defendants' expert testimony inadmissible.

Moreover, plaintiff's second argument is illogical. Mr. Cohen's second and third opinions do not contradict the first. The first opinion expresses a view on his inability to determine a quantitative amount of exposure, while the second and third opinions express the view that a qualitative opinion (whether the exposure was within specified levels) can be determined. As defendants point out, plaintiff's medical causation experts have drawn analogous conclusions, opining that although plaintiff's exposure cannot be quantified, they are able to diagnose him with RADS and conclude that he was exposed to a high level of Dynaprime vapors.

Therefore, plaintiff's motion to exclude Mr. Cohen's second and third opinions is denied.

### E. Plaintiff's Objections to Magistrate Judge Brown's June 17, 2011, Memorandum Opinion and Order

Plaintiff has filed objections to Magistrate Judge Brown's memorandum opinion and order dated June 17, 2011, denying plaintiff's motion to supplement Dr. Milby's expert disclosure under Rule 26(e). Plaintiff argues that "because the addition of after-arising medical testing to a medical expert's report is commonplace and uncontroversial," "Judge Brown erred in denying [his] motion." But Magistrate Judge Brown's well-reasoned opinion—which this court may alter only if it is "clearly erroneous or contrary to law"—explains that this is not a case of supplementing a medical expert's report with new testing. Fed. R. Civ. P. 72. Rather, plaintiff has attempted to supplement Dr. Milby's disclosures with tests he did not administer and upon which his expert report did not rely. As defendants point out, Dr. Milby's report did not include even those reports on which he did rely, so it is clear that inclusion of such reports is necessary.

Because plaintiff has acknowledged that "arguably, Dr. Pacheco's test results do not constitute 'supplementation' because they do not alter Dr. Milby's disclosure and have been previously disclosed to Defendants," Magistrate Judge Brown's agreement with that position is not clearly erroneous or contrary to law. Plaintiff's objections are overruled.

## CONCLUSION

For the foregoing reasons, the court denies defendants' motion to exclude plaintiff's experts and for summary judgment [Dkt. 177], denies as moot plaintiff's motion to strike Exhibit I [Dkt. 193], denies as moot plaintiff's motion to supplement his response in opposition to defendants' motion to exclude [Dkt. 195], and denies plaintiff's motion to strike Mr. Cohen's opinions two and three [Dkt. 208]. Plaintiff's objections to Magistrate Judge Brown's June 17, 2011, order [Dkt. 179] are denied.

**ENTER:** March 15, 2012

_____
**Robert W. Gettleman**
**United States District Judge**